IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JEFFREY J. SILVER          *

     Plaintiff          *

     vs.          *   CIVIL ACTION NO. MJG-16-382

WELLS FARGO BANK, N.A., et al.  *

     Defendants          *

*    *    *    *    *    *    *    *    *

MEMORANDUM AND ORDER RE: AMENDED COMPLAINT

The Court has before it Wells Fargo Bank, N.A.'s Motion to
Dismiss Claims Asserted Against It in the Amended Complaint [ECF
No. 40], PNC Bank, National Association's Motion to Dismiss
Plaintiff Jeffrey J. Silver's Amended Complaint [ECF No. 43],
and the materials submitted relating thereto.  The Court finds a
hearing unnecessary.

I.   BACKGROUND

From sometime in 2007 until about November 24, 2012,
Plaintiff Jeffrey J. Silver ("Silver") was the victim of a check
fraud scheme perpetrated by Katherina Cheek ("Cheek"), one of
his employees.  Cheek stole, forged, and negotiated checks drawn
on Silver's checking account at PNC Bank, National Association
("PNC") and had the proceeds end up in her own account at Wells
Fargo Bank, National Association ("Wells Fargo") through a
"double forgery" scheme.

1

Silver asserts claims against PNC and Wells Fargo ("Defendants") pursuant to the Maryland Uniform Commercial Code, Md. Code Ann., Com. Law § 1-101 et seq.,[1] for lack of ordinary care and good faith, breach of presentment warranties, strict liability, and conversion.  Silver also asserts common law claims of negligence, breach of contract, negligent hiring and/or retention of employees, constructive fraud, and civil conspiracy.

By the instant motions, Defendants seek dismissal of all claims against them pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.[2]

## II.  DISMISSAL STANDARD

A motion to dismiss filed pursuant to Rule 12(b)(6) tests the legal sufficiency of a complaint.  A complaint need only contain "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (alteration in original) (citations omitted).

---

[1]    Hereinafter referred to as "UCC" or "Maryland UCC."  The Maryland General Assembly adopted Revised UCC articles 3 and 4 and codified it at Titles 3 and 4 of the Commercial Law Article of the Maryland Code.  The Commercial Law Article is referred to as the "Maryland UCC."  Shepherd v. Burson, 50 A.3d 567, 573 (Md. 2012).

[2]    All "Rule" references herein are to the Federal Rules of Civil Procedure.

When evaluating a 12(b)(6) motion to dismiss, a plaintiff's well-pleaded allegations are accepted as true and the complaint is viewed in the light most favorable to the plaintiff. However, conclusory statements or "a formulaic recitation of the elements of a cause of action will not [suffice]." Id. A complaint must allege sufficient facts "to cross 'the line between possibility and plausibility of entitlement to relief.'" Francis v. Giacomelli, 588 F.3d 186, 193 (4th Cir. 2009) (quoting Twombly, 550 U.S. at 557).

Inquiry into whether a complaint states a plausible claim is "'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" Id. (quoting Twombly, 550 U.S. at 557). Thus, if "the well-pleaded facts [contained within a complaint] do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'" Id. (quoting Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009) (alteration in original)).

Generally, a motion to dismiss filed under Rule 12(b)(6) cannot reach the merits of an affirmative defense. Goodman v. Praxair, Inc., 494 F.3d 458, 464 (4th Cir. 2007). It is possible to evaluate such a motion, however, if all the facts necessary to the affirmative defense are clearly alleged on the face of the complaint. Id. But if the complaint does not

3

clearly reveal the existence of a meritorious affirmative

defense, it is inappropriate for the court to consider it under

a Rule 12(b)(6) motion.  <u>Richmond, Fredericksburg & Potomac</u>

<u>R.R. Co. v. Forst</u>, 4 F.3d 244, 250 (4th Cir. 1993).


III. <u>DISCUSSION</u>

   A. <u>Factual Allegations</u>[3]

   At all times relevant hereto, Silver, a Baltimore City

attorney, maintained several accounts (checking and other types)

with PNC and Wells Fargo.[4]

   Silver employed Ms. Katherina Cheek[5] ["Cheek" or

"Assistant"] as a legal assistant whose duties included matters

related to Silver's checking accounts.  Beginning at "some point

in 2007,"[6] Cheek began her scheme that continued until November

2012.  In the scheme, Cheek stole hundreds of Silver's blank

checks for one of Silver's PNC accounts and forged Silver's

signature as the "drawer"[7] on the checks.  In the scheme, Cheek

created and negotiated three categories of forged checks:

---

[3]   The "facts" herein are as alleged by Plaintiff and are not
necessarily agreed upon by Defendants.
[4]   Silver had a banking relationship with Wells Fargo's
predecessors, including Wachovia and First Union National Bank
since the early 1990s.  Silver also was a customer of PNC's
predecessor, Mercantile Safe Deposit and Trust Company, since
1988.
[5]   f/k/a/ Katherina Young.
[6]   Silver is not sure of the exact time that the scheme began,
but believes it began in 2007. ¶ 49.
[7]   "'Drawer' means a person who signs or is identified in a
draft as a person ordering payment." UCC § 3-103(a)(3).

(1) checks made payable to Cheek herself, which were negotiated using her genuine indorsement;

(2) checks made payable to local businesses as "fictitious payees," upon which Cheek forged the businesses' indorsements with scribbled signatures, not commercial stamps; and

(3) checks made payable to persons who were Cheek's friends and creditors, upon which Cheek forged the indorsements. ¶[8] 10.

The last two categories of checks can be described as "double forgeries" because they contained forged drawee signatures and forged payee indorsements.

Cheek often presented the checks to Wells Fargo two or three at a time and cashed or deposited the proceeds of the fraudulent checks into her personal bank account — not an account belonging to the fictitious payee — at Wells Fargo (the "depository bank" or "collecting bank"[9]). ¶¶ 10, 17, 49. Some of these can be referred to as "third-party" checks, i.e., checks drawn to a person other than the holder of the account into which the proceeds are to be deposited. These "third-party" checks generally are considered high-risk by banks and require manager approval before depositing. ¶ 47. The Amended Complaint alleges that the tellers at Wells Fargo violated Wells Fargo requirements by accepting the stolen checks without

---

[8]    All ¶ references herein refer to paragraphs of the Amended Complaint [ECF No. 35].

[9]    "'Depository bank' means the first bank to take an item even though it is also the payor bank unless the item is presented for immediate payment over the counter."
       "'Collecting bank' means a bank handling an item for collection except the payor bank." UCC § 4-105.

manager approval and without verifying Silver's purported signature against his signature cards on file at Wells Fargo. ¶ 17.

Wells Fargo presented the forged checks for payment to PNC (the "drawee" or "payor bank"[10]). PNC accepted and paid the forged checks without verifying Silver's signature.

Cheek wrongfully negotiated at least 215 of the forged checks between January 1, 2011, and November of 2012,[11] obtaining at least $111,302.15. ¶ 49. Silver did not owe money to any of the payees on these checks, and at no time did Silver authorize Cheek to sign Silver's name, draw, or indorse any of these checks.

Silver first discovered Cheek's check fraud scheme on November 24, 2012, several years after the scheme had started in 2007. Silver immediately met with a PNC branch manager[12] ("the Manager"), who reviewed Silver's accounts and the alleged unauthorized checks for the three to four months prior. The Manager was "surprised and shocked that the instruments were honored" by PNC and accepted by Wells Fargo. ¶ 33. The Manager called his wife, who currently worked, or had just left her

_____

[10]    "'Drawee/ means a person ordered in a draft to make payment." § 3-103(a)(2).
        "'Payor bank' means a bank that is the drawee of a draft. § 4-105(3).
[11]    At this time, Silver is unable to identify specific forged checks before 2011.
[12]    "[B]elieved to have been Michael Stein." ¶ 33.

6

employment, for Wells Fargo, and the Manager determined that "the fraudulent check deposits had been  made in violation of several of Wells Fargo's banking procedures." Id.

The Manager referred the matter to Robert Smetzer ("Mr. Smetzer"), Assistant Vice President/Senior Fraud Investigator for PNC.  The Manager told Silver that PNC would do as much as it could to help Silver recoup his losses.  However, on January 11, 2013, Mr. Smetzer sent Silver a letter indicating that PNC was not going to take action on the alleged fraudulent activity or try to recoup any money from Wells Fargo.

Neither PNC nor Wells Fargo have paid or credited Silver the amounts charged against his account due to the check fraud scheme.

### B. Procedural Posture

Silver filed this lawsuit in the Circuit Court for Baltimore County, Maryland on November 23, 2015.  A Notice of Removal was filed properly on February 10, 2016. [ECF No. 1].

On November 29, 2016, this Court dismissed the Complaint by the November Order [ECF No. 34].  However, in its Memorandum and Order the Court stated that "Plaintiff may, by January 15, 2017 file an Amended Complaint. Id. at 23. Plaintiff filed the

Amended Complaint [ECF No. 35] on January 17, 2017.[13]

In the Amended Complaint, Silver asserts claims against the Defendants in ten Counts:

> Count I:  Lack of Ordinary Care and Good Faith – Violation of Md. Code Ann., Com. Law §§ 3-404, 3-405, 3-406
>
> Count II:  Breach of Presentment Warranties – Violation of Md. Code Ann., Com. Law §§ 3-417, 4-208
>
> Count III: Breach of Contract
>
> Count IV:  Negligence as to PNC
>
> Count V:   Negligence as to Wells Fargo
>
> Count VI:  Strict Liability – Violation of Md. Code Ann., Com. Law §§ 3-403, 4-401
>
> Count VII: Negligent Hiring and/or Retention of Employees
>
> Count VIII: Constructive Fraud
>
> Count IX:  Civil Conspiracy
>
> Count X:   Conversion – Violation of Md. Code Ann., Com. Law § 3-420.

[ECF No. 35].

C.  <u>Maryland Uniform Commercial Code Claims</u>

The Amended Complaint presents statutory (UCC) claims[14] for

---

[13]   On March 9, 2017, the Court entered a Judgment Order [ECF No. 45] against Plaintiff for failure to file a timely response to the instant Motions to Dismiss the Amended Complaint. [ECF No. 44].  However, on March 14, 2017, the Court granted Plaintiff's Motion for Relief from the [Judgment] Order [ECF No. 46] and granted Plaintiff additional time to respond to the dismissal motions. <u>See</u> Order Reopening Case [ECF No. 47].

lack of ordinary care (Count I), breach of presentment warranties (Count II), strict liability for wrongful payment (Count VI), and conversion (Count X) under Titles 3 and 4 of the Maryland UCC.

In the Motions to Dismiss, Defendants contend that (1) Silver's allegations fail to plead plausible claims, (2) no cause of action exists against one or both banks for breach of presentment warranty, conversion, violation of UCC § 4-401, and common law negligence, and (3) the UCC statute of limitations, the § 3-406 "twelve-month rule," and/or the PNC Account Agreement bar recovery on Silver's UCC claims that accrued prior to November 24, 2015.

### 1. Lack of Ordinary Care and Good Faith – §§ 3-404 to 3-406 (Count I)

In Count I, the Amended Complaint presents claims under UCC §§ 3-404, 3-405, and 3-406. Sections 3-404 and 3-405 provide that a victim of check fraud caused by an "impostor" or an employee may recover from a bank that failed to exercise "ordinary care" when paying or taking the fraudulent check. §[15] 3-404 ("[T]he person bearing the loss may recover from the

---

[14]   The UCC governs negotiable instruments and the relationship between banks and customers.  Cf. Lema v. Bank of Am., N.A., 826 A.2d 504, 508–09 (Md. 2003).

[15]   All § references herein are to the Maryland Commercial Law Article/ Maryland UCC.

person failing to exercise ordinary care to the extent the failure to exercise ordinary care contributed to the loss."). Section 3-405 contains almost identical language.

### a. The Impostors Provision — § 3-404

The "impostors" provision, § 3-404, applies when "an instrument is payable to a fictitious or nonexisting person and to cases in which the payee is a real person but the drawer or maker does not intend the payee to have any interest in the instrument." Official Comment 2 to Md. Code Ann., Com. Law § 3-404.

This provision is relevant to checks made out by Cheek to payees other than herself because neither Cheek nor Silver intended the payees to have an interest in the check.

### b. Employee Fraud Provision — § 3-405

Section 3-405, the "employee fraud" provision, states:

> if an employer entrusted an employee with responsibility with respect to the instrument and the employee . . . makes a fraudulent indorsement of the instrument, the indorsement is effective as the indorsement of the person to whom the instrument is payable if it is made in the name of that person.

Id. § 3-405(b).

Section 3-405 covers cases where an account owner's employee makes a fraudulent indorsement, either in the employer's name, if the employer is the payee, or "in the name of payees of instruments issued by the employer." Official

Comment 1 to Md. Code Ann., Com. Law § 3-405.

Here, § 3-405 could apply if Cheek had "responsibility"[16] with regard to Silver's checks. The Amended Complaint does not present factual allegations adequate to support a plausible claim of the requisite "responsibility."

### c. Loss Allocation Provision — § 3-406

Section 3-406 establishes a comparative negligence scheme allocating loss between the bank and the customer if both parties failed to exercise ordinary care that contributed to a fraudulent instrument.

### d. Analysis

Using these three provisions,[17] Silver claims that the Defendants failed to exercise ordinary care and good faith when accepting and paying the forged checks. Defendants assert that Silver does not adequately plead facts in the Amended Complaint to present plausible claims and that his allegations are conclusory.

---

[16]    In this context, the term "responsibility" refers to authority defined in § 3-405(a) and "does not include authority that merely allows an employee to have access to instruments or blank or incomplete instrument forms that are being stored or transported or are part of incoming or outgoing mail, or similar access." § 3-405.

[17]    It is not necessary for this Court to determine if § 3-406 provides an affirmative cause of action on its own because §§ 3-404 and 3-405 do provide a cause of action for lack of ordinary care.

Under the UCC, "ordinary care" means "observance of reasonable commercial standards." § 3-103. "Failure to exercise ordinary care is to be determined in the context of all the facts relating to the bank's conduct with respect to the bank's collection of the check," including the names on the account, amount of check, circumstances of account opening, and actions of account holder. Official Comment 4 to § 3-405.

The Amended Complaint includes factual allegations that adequately present a plausible claim that the banks did not exercise ordinary care in regard to the checks at issue. For example, the Amended Complaint alleges that:

- Silver had been a victim of bank fraud before, most recently in 2011, and his accounts at PNC were marked as being "victims of fraud" to notify employees to be vigilant for fraudulent activity. ¶ 29.

- The check fraud scheme lasted for approximately five years and involved at least 215 checks presented for unauthorized payment from 2011-2012. ¶ 49.

- The checks bore a forged drawer signature (Silver's) and forged or missing payee indorsements. ¶ 10.

- "Most" of the checks were indorsed with a "scribbled signature without a commercial stamp even though the majority of these checks were written to local commercial businesses (as fictitious payees)." ¶ 10.

- The checks were "on their face exceedingly suspicious," "known to be high-risk, third-party checks payable to a person other than the accountholder," and "required manager approval prior to final payment." ¶ 65.

- The Manager at PNC expressed shock that the checks were ever accepted and honored because of their suspicious character. ¶ 33.

- The Manager at PNC, after speaking with a Wells Fargo employee, determined that the checks violated PNC's and Wells Fargo's anti-fraud standards and referred Silver to Mr. Smetzer. Id.

Thus, the Amended Complaint presents factual allegations presenting a plausible claim that Defendants did not exercise ordinary care when they accepted hundreds of checks made payable to local businesses (and others) that were endorsed and deposited by the Assistant into her account, even though she was not affiliated with those payees' businesses. Silver alleges that Wells Fargo employees were required to get manager approval to accept the third-party checks, which they failed to do. The suspicious character of the checks was confirmed, allegedly, by employees of both Defendants. Additionally, PNC was already aware that Silver had been a victim of fraud.

Viewed in a light most favorable to Silver, the foregoing allegations present facts adequate to plead a plausible claim based on Defendants' alleged failure to exercise ordinary care and present viable claims, at least pursuant to § 3-404, in Count I.

2. <u>Breach of Presentment Warranties — § 3-417 and § 4-208 (Count II)</u>

In Count II, the Amended Complaint asserts that Wells Fargo breached UCC presentment warranties and that PNC breached its obligation to present warranty claims to Wells Fargo on behalf of Silver.

As explained in the November Order [ECF No. 35], no breach of presentment cause of action runs to Silver, the drawer. <u>See Bank Polska Kasa Opieki, S.A. v. Pamrapo Sav. Bank, S.L.A.</u>, 909 F. Supp. 948, 955 (D.N.J. 1995)(holding that presentment warranties under UCC § 3-417 do not run to the drawer); <u>Great Lakes Higher Educ. Corp. v. Austin Bank of Chicago</u>, 837 F. Supp. 892, 897 (N.D. Ill. 1993)(holding the same). "Warranty to the drawer is governed by subsection (d) and that applies only when presentment for payment is made to the drawer with respect to a dishonored draft." Official Comment 2 to Md. Code Ann., Com. Law § 3-417. The drafts in this case were not dishonored, and thus no warranties were made to Silver as drawer.

Furthermore, Silver has failed to identify any legal authority that requires PNC to assert a warranty claim on his behalf.

Accordingly, the claims in Count II shall be dismissed.

### 3. <u>Payment of Unauthorized Items — § 4-401 (Count VI)</u>

The Amended Complaint in Count VI asserts that both Defendants are strictly liable[18] under UCC § 4-401 for honoring checks that were not properly payable under § 3-403.[19]

By its terms, § 4-401 does not apply to Wells Fargo because it was the depository bank, not the drawee bank, and did not charge anything against Silver's account.

Although Silver has pled a plausible claim under § 4-401 against PNC, he failed to bring his claim within the three-year limitations period as discussed below. All claims in Count VI shall be dismissed.

### 4. <u>Conversion — §3-420 (Count X)</u>

The Amended Complaint adds a claim against both Defendants for conversion pursuant to § 3-420.

"An action for conversion of an instrument may not be brought by (i) the issuer or acceptor of the instrument." <u>Id.</u> § 3-420(a). Silver is an "issuer"[20] and may not sue PNC, the

---

[18]    Although Silver uses the term "strict liability," the Maryland Court of Appeals has stated that "banks are not to be held strictly liable for every wrongful disbursement." <u>Schultz v. Bank of Am., N.A.</u>, 990 A.2d 1078, 1086 (Md. 2010). Instead, a duty of ordinary care applies. <u>Id.</u>

[19]    Section 3-403 designates that "an unauthorized signature is ineffective except as the signature of the unauthorized signer in favor of a person who in good faith pays the instrument or takes it for value."

[20]    An "issuer" is "a maker or drawer of an instrument." <u>Id.</u> §

drawee bank, or Wells Fargo, the depositary bank, for

conversion. <u>See Chicago Title Ins. Co. v. Allfirst Bank</u>, 905

A.2d 366, 376 n.12 (Md. 2006); <u>Simmons v. Lennon</u>, 773 A.2d 1064,

1069 n.6 (Md. Ct. Spec. App. 2001). Comment 1 to § 3-420

states:

> There is no reason why a drawer should have an action
> in conversion. The check represents an obligation of
> the drawer rather than property of the drawer. The
> drawer has an adequate remedy against the payor bank
> for recredit of the drawer's account for unauthorized
> payment of the check.

Official Comment 1 to Md. Code Ann., Com. Law § 3-420.

Additionally, as addressed below, Silver's conversion

claims are untimely. Accordingly, Count X shall be dismissed.

### 5. Timeliness

Defendants assert a timeliness defense against Silver's UCC

claims.

Title 3 of the Maryland UCC provides that:

> an action (i) for conversion of an instrument,
> for money had and received, or like action based on
> conversion, (ii) for breach of warranty, or (iii) to
> enforce an obligation, duty, or right arising under
> this article and not governed by this section must be
> commenced within 3 years after the cause of action
> accrues.

Md. Code Ann., Com. Law § 3-118(g)(2013 Repl. Vol.).

Similarly, Section 4-111 states, "[a]n action to enforce an

obligation, duty, or right arising under this title must be

---

3-105(c).

commenced within 3 years after the cause of action accrues." Id.
§ 4-111.

However, § 3-118 and § 4-111 do not specify when it is that
a cause of action accrues.  Generally, in Maryland, the
discovery rule applies to torts.  Hecht v. Resolution Trust
Corp., 635 A.2d 394, 399 (Md. 1994).  Silver contends that the
discovery rule should toll the three-year limitations period
until he discovered the check fraud scheme on November 24, 2012.
The Defendants contend that Silver's UCC causes of action
accrued as to each check on the date such check was honored, and
are thus untimely.

In Advance Dental Care, Inc. v. Suntrust Bank, 906 F. Supp.
2d 442 (D.Md. 2012), Judge Williams, writing for this Court,
decided that the Maryland Court of Appeals would hold that the
discovery rule does not apply to UCC conversion claims.  Id. at
445, 447 ("[A]pplying the discovery rule to § 3-118(g) of the
Maryland UCC would thwart the intent of the Maryland legislature
and contravene public policy.").  This holding aligns with the
majority approach that the Court finds persuasive.[21]  According
to the United States Court of Appeals for the Seventh Circuit:

---

[21]    See, e.g., Travelers Cas. & Sur. Co. of Am. v. Nw. Mut.
Life Ins. Co., 480 F.3d 499, 504 (7th Cir. 2007); John Hancock
Fin. Servs., Inc. v. Old Kent Bank, 346 F.3d 727, 734 (6th Cir.
2003); Menichini v. Grant, 995 F.2d 1224, 1229-32 (3d Cir.
1993); Kuwait Airways Corp. v. American Sec. Bank, N.A., 890
F.2d 456, 460-63, 466 (D.C. Cir. 1989).

> [A]pplication of the discovery rule would be inimical to the underlying purposes of the UCC, including the goals of certainty of liability, finality, predictability, uniformity, and efficiency in commercial transactions. In keeping with those goals, negotiable instruments are intended to function efficiently, and liability on those instruments is not meant to be open-ended.

Rodrigue v. Olin Employees Credit Union, 406 F.3d 434, 445–46 (7th Cir. 2005).

Furthermore, the Maryland UCC expressly designates that certain causes of action[22] are subject to the discovery rule, which indicates that the General Assembly did not intend for the discovery rule to apply to other provisions that do not contain that directive. Advance Dental Care, Inc., 906 F. Supp. 2d at 449.

Additionally, in conversion cases, the injured party is often the one in the best position to prevent and discover the injury caused by conversion.

> [T]he public would be poorly served by a rule that effectively shifts the responsibility for careful bookkeeping away from those in the best position to monitor accounts and employees. Strict application of the limitation period, while predictably harsh in some cases, best serves the twin goals of swift resolution of controversies and "certainty of liability" advanced by the U.C.C.

Menichini v. Grant, 995 F.2d 1224, 1230 (3d Cir. 1993).

---

[22]    See, e.g., Md. Code, Com. Law §§ 3-417(f), 4-207(e), 4-208(f)(2013 Repl. Vol.) ("A cause of action for breach of warranty under this section accrues when the claimant has reason to know of the breach.").

Maryland courts have not expressly determined whether the discovery rule applies to other causes of action brought under UCC Article 3 (§§ 3-404 and 3-405), or to claims under UCC Article 4 (§ 4-401), although courts in other jurisdictions have.[23]

The Court finds persuasive the reasoning in Advance Dental Care, and concludes that the Maryland Court of Appeals would hold that the discovery rule does not apply to §§ 3-404, 3-405, and 4-401 claims. The policies underlying the UCC — uniformity, finality, predictability, and ease of negotiability — apply in the contexts of §§ 3-404, 3-405, and 4-401 as they do in the UCC

---

[23] See Bandy v. Fifth Third Bank, No. 1:08 CV 1064, 2011 WL 4463415, at *7 (N.D. Ohio Sept. 27, 2011), aff'd, 519 F. App'x 900 (6th Cir. 2013)(discovery rule does not apply to UCC § 4-401 claims); United States v. Zarra, No. CIV.A. 10-811, 2011 WL 3667313, at *2 (W.D. Pa. Aug. 22, 2011)(determining that under UCC § 411, a cause of action accrues at time of negotiation and discovery rule is inapplicable); Vedos v. King, 115 Wash. App. 1030, *2 (2003)(cause of action pursuant to UCC § 4-401 accrues at time check is wrongfully paid); Willier, Inc. v. Hurt, No. CIV.A. 5:06-CV-00547, 2007 WL 4613033, at *5-*6 (S.D.W. Va. Dec. 31, 2007) (determining that the discovery rule does not apply in UCC cases, including claims under UCC § 3-405); Sebastian v. D & S Exp., Inc., 61 F. Supp. 2d 386, 389 (D.N.J. 1999)(holding that the discovery rule does not apply to claims under UCC § 3-404 and a cause of action accrues at time the check is negotiated). But see Newell v. Newell, 942 N.E.2d 776, 782 (2011)(holding discovery rule applies to breach of contract claim brought pursuant to UCC Article 4); Borchers v. Vanguard Grp. Inc., No. 2:08-CV-02138-REJ, 2011 WL 2690424 (D. Ariz. July 11, 2011)(suggesting without deciding that discovery rule would apply to UCC Article 4 claims).

conversion provision.

Application of the discovery rule "is appropriate where
'stealth, subterfuge, or other difficulties of detection leave a
plaintiff blamelessly ignorant of the facts and circumstances
legally entitling him or her to relief.'" Advance Dental Care,
Inc., 906 F. Supp. 2d at 447 (quoting Murphy v. Merzbacher, 697
A.2d 861, 865 (Md. 1997)). These "difficulties of detection"
are generally not present in an "information-rich environment,
[such as the case at bar in which] the weapon that inflicted an
injury was the victim's own check." Travelers Cas. & Sur. Co. of
Am. v. Nw. Mut. Life Ins. Co., 480 F.3d 499, 504 (7th Cir.
2007).

Silver stood in the best place to discover Cheek's
lucrative and lengthy fraud scheme and the Defendants'
collection and payment of the forged checks. Much of Silver's
loss could have been prevented through better management.
Management responsibility is contemplated by UCC § 4-406, which
imposes a duty on customers to inspect their bank records and
promptly notify banks of discrepancies. It is also notable that
there is no evidence of concealment or fraud on the part of the
Defendants, or other exigent circumstances, that would implicate
doctrines of equitable tolling or estoppel.

Silver relies on PSI Resources, LLC v. MB Financial Bank,
National Association, 55 N.E.3d 186 (Ill. App. 1 Dist. 2016),

wherein the Illinois court held that the discovery rule applied to a common law breach of contract claim that was governed by the UCC's statute of limitations. PSI Resources is distinguishable because it involved a common law cause of action — not a violation of the UCC — thus, statutory-specific policies were not implicated. Cf. Advance Dental Care, Inc., 906 F. Supp. 2d at 448 ("[T]he fact that the discovery rule is applied to other civil actions pursuant to § 5-101 does not automatically warrant its application to § 3-118(g) of the UCC.").

Therefore, the Court concludes that the discovery rule did not toll the UCC's three-year limitations period and Silver's UCC causes of action accrued at the time when each check was negotiated. Accordingly, it is unnecessary for the Court to discuss here the applicability of the time restrictions of the § 4-406(f) "twelve month rule" or the PNC Account Agreement. It suffices to state that the allegations in the Amended Complaint plainly reveal that the claims regarding all checks paid prior to November 23, 2012 are time barred by virtue of the generally applicable three-year limitations period.

Because Silver filed suit on November 23, 2015, his UCC claims in Counts I (violations of §§ 3-404 and 3-405), VI

(violations of § 4-401), and X (conversion) are untimely as to any check paid before November 23, 2012.[24]

### D. Common Law Claims

#### 1. Breach of Contract (Count III)

Silver asserts a breach of contract claim against both Defendants for failing to verify the signatures on the fraudulent checks, and against PNC for failing to credit Silver for his losses and make warranty claims against Wells Fargo.

To succeed on a breach of contract claim, a plaintiff must allege that the defendant owed a contractual obligation and that this obligation was materially breached. RRC Ne., LLC v. BAA Maryland, Inc., 994 A.2d 430, 440 (Md. 2010).

Defendants contend that Silver failed to allege the existence of a specific contractual obligation.

The Amended Complaint adequately pleads the existence of a plausible contractual duty and breach of that duty by PNC. The Amended Complaint alleges that PNC agreed in the Rules and Regulations for Deposit Accounts that it would only honor checks signed by an Authorized Signer listed on the Signature Card, and would rely on the Signature Card to verify a check signature. ¶¶

---

[24] Attached to the Amended Complaint as Exhibit A, is a reproduced "sampling" of the alleged fraudulent checks. All of the included checks were deposited before November 23, 2012. If, however, any check was paid after November 23, 2012, Silver may have a valid cause of action.

73-74. The Amended Complaint also asserts that PNC failed to do this. These allegations are adequate to present a breach of contract action against PNC. See G&D Furniture Holdings, Inc. v. SunTrust Bank, No. CV TDC-16-2020, 2016 WL 7441607, at *4 (D. Md. Dec. 22, 2016)(finding similar allegations of breach of contract adequate to survive dismissal).

Furthermore, the Amended Complaint adequately alleges that both Defendants breached the banks' contractual duties of ordinary care. See Schultz v. Bank of Am., N.A., 990 A.2d 1078, 1093 (Md. 2010) ("There was therefore no need for Petitioner to establish all the terms of the alleged contract between Schultz and the Bank because the Commercial Code provided the relevant term: the duty of ordinary care.").

A bank has an implied in fact contractual relationship with its customer. Id. at 1092 n. 20. Under this implied contract, as codified in the UCC, a bank owes a duty of ordinary care to its customer. Id.; see also Taylor v. Equitable Trust Co., 304 A.2d 838, 842-43 (Md. 1973)("[T]he UCC codifies the underlying contract implied between the bank and its customer that the bank will charge any item which is 'otherwise properly payable' against the depositor's account only on the order of the depositor."). A customer may enforce this duty through an action for breach of contract. Schultz, 990 A.2d at 1092.

Silver adequately alleges that he is a customer[25] in a contractual relationship with both Defendants.  As demonstrated by their maintaining his accounts and signature cards, PNC and Wells Fargo owed Silver a duty of ordinary care.

As previously discussed herein, the Amended Complaint's allegations adequately plead failure to exercise ordinary care.

Therefore, the claims in Count III shall not be dismissed.[26]

## 2. Negligence (Counts IV - V)

Silver asserts common law negligence claims against both Defendants, but, at least in this instance, the UCC replaces a common law negligence claim. Advance Dental Care, Inc. v. SunTrust Bank, 816 F.Supp. 2d 268, 270-71 (D. Md. 2011)("[C]ommon-law negligence claims can proceed only in the absence of an adequate U.C.C. remedy.").

---

[25]   A "customer" is "a person having an account with a bank or for whom a bank has agreed to collect items." Md. Code Ann., Com. Law § 4-104(a)(5).

[26]   As explained by the Court in Schultz,

There is no contradiction in allowing a party to enforce the duty of ordinary care through a contract claim, a tort claim, or both. We noted in Jacques v. First Nat'l Bank, 307 Md. 527, 545, 515 A.2d 756, 765 (1986), that "[a]lthough the proof required and the measure of compensatory damages allowable may be essentially the same under either cause of action, there are other considerations ... that make it desirable to provide a choice of actions."

Schultz, 990 A.2d at 1092 n.21.

24

As stated in the November Order [ECF No. 34], the UCC provides an adequate remedy against both Defendants in §§ 3-404, 3-405, and/or 4-401. See 6C Anderson U.C.C. § 4-401:10 (3d. ed.) ("UCC § 4-401 displaces any common-law action for negligence against a bank paying a check on which the drawer's signature is forged"); see also Gina Chin & Assocs., Inc. v. First Union Bank, 500 S.E.2d 516, 518 (Va. 1998)(holding that a victim of double forgery can bring a causes of action against a depository bank pursuant to UCC § 3-404 and § 3-405).

Unlike other cases where Maryland courts have allowed negligence suits for violation of the UCC's duty of care,[27] Silver's common law negligence claim has no independent significance apart from his UCC claims. The instant case involves forged checks that were not properly payable under the UCC, and thus the claims fall under the UCC's purview. In contrast, in Chicago Title Ins. Co. v. Allfirst Bank, 905 A.2d 366, 376-77 (Md. 2006), the Maryland Court of Appeals determined that a common law negligence cause of action was appropriate because the check at issue contained no forgery or improper indorsement and was thus properly payable under the UCC.

---

[27]  See, e.g., Schultz, 990 A.2d at 1086 (allowing negligence suit in case arising from addition of a third party's name on bank customer's checking account); Novara v. Manufacturers & Traders Trust Co., No. CIV.A. ELH-11-736, 2011 WL 3841538, at *9 (D. Md. Aug. 26, 2011)(involving collection of payments in satisfaction of notes).

Silver implicitly recognizes the adequacy of the UCC remedies by bringing claims under those provisions. <u>See</u> <u>Great Lakes Higher Educ. Corp. v. Austin Bank of Chicago</u>, 837 F. Supp. 892, 896 (N.D. Ill. 1993)("[Plaintiffs] have other remedies under the UCC which they have alternatively plead in their complaint, thus showing that a common law action for negligence is unnecessary and may not be alleged here.").

Furthermore, a common law negligence claim would be essentially duplicative of a breach of contract claim.

Accordingly, all claims in Counts IV and V shall be dismissed.

### 3. <u>Negligent Hiring and/or Retention of Employees</u> <u>(Count VII)</u>

In Count VII, the Amended Complaint claims that the Defendants breached their duty to use reasonable care to select and retain employees who could competently perform banking transactions, which resulted in bank employees accepting fraudulent checks.

In a negligent hiring case, a plaintiff must establish the following five elements:

(1) the existence of an employment relationship;

(2) the employee's incompetence;

(3) the employer's actual or constructive knowledge of such incompetence;

>    (4) the employee's act or omission causing the plaintiff's
>        injuries; and
>
>    (5) the employer's negligence in hiring[, supervising] or
>        retaining the employee as the proximate cause of
>        plaintiff's injuries.

Latty v. St. Joseph's Soc. of Sacred Heart, Inc., 17 A.3d 155,

165 (Md. Ct. Spec. App. 2011)(internal citations omitted).

"[T]he employer must make some reasonable inquiry before hiring

or retaining the employee to ascertain his fitness, or the

employer must otherwise have some basis for believing that he

can rely on the employee." Jones v. State, 38 A.3d 333, 343 (Md.

2012) (quoting Horridge v. St. Mary's County Dep't of Soc.

Servs., 854 A.2d 1232, 1237-38 (Md. 2004)).

    "Under Maryland law, an employer's liability in this regard

is not to be reckoned simply by the happening of the injurious

event.  Rather, there must be a showing that the employer failed

to use reasonable care in making inquiries about the potential

employee, or in supervising or training the employee."

Economides v. Gay, 155 F. Supp. 2d 485, 489 (D.Md. 2001)(quoting

Gay v. United States, 739 F.Supp. 275, 276 (D.Md. 1990))

(internal citations omitted).

    The Amended Complaint does not adequately allege facts

presenting a plausible claim that the Defendants had knowledge

of employee incompetence or otherwise failed to use reasonable

care in hiring, training, or supervising the employees.  In the

Amended Complaint, Silver names Mr. Smetzer and the bank tellers as the negligent employees and states that the tellers never questioned 215 checks is "extreme evidence of the incompetence of both banks' employees and proof that they were inadequately trained and retained." ¶ 49. This allegation is conclusory and points only to the "injurious event" as evidence of negligent supervision. This is not adequate to plead a cause of action for negligent supervision and/or retention.

All claims in Count VII shall be dismissed.

### 4. Constructive Fraud (Count VIII)

The tort of constructive fraud requires a breach of a legal or equitable duty, which "the law declares fraudulent because of its tendency to deceive others, to violate public or private confidence, or to injure public interests." Ellerin v. Fairfax, Sav., F.S.B., 652 A.2d 1117, 1126 n.11 (Md. 1995)(quoting Scheve v. McPherson, 408 A.2d 1071, 1076 (Md. Ct. Spec. App. 1979)).

Silver claims that the Defendants owed him a fiduciary duty to properly manage his banking affairs and that they breached that duty by acting carelessly, ignoring suspicious facts, and not preventing Cheek from cashing fraudulent checks.

"At common law, the relationship of a bank to its customer was not considered to be fiduciary in nature, but rather as that of a debtor and his creditor." Suburban Trust Co. v. Waller, 408

A.2d 758, 762 (Md. Ct. Spec. App. 1979). In its November Order,
the Court notified Silver of the need to comply with the
particularity requirement of Rule 9(b) and to plead the
existence of an agreement or other special circumstances
establishing a fiduciary duty between him and either Defendant.[28]
The Amended Complaint does not do so.

Instead, the Amended Complaint alleges that PNC failed to
take action because the Defendants, and other national banks,
"collude with each other in a scheme whereby their own banking
customers are treated poorly . . . when banking customers fall
victim to fraud . . . [in order to] absolve themselves of
numerous administrative details." ¶ 37. These allegations are
conclusory and do not adequately present a claim of constructive
fraud. See Tech. Partners, Inc. v. Regions Bank, 245 S.W.3d 687,
694 (Ark. App. 2006)(finding that bank's failure to verify
embezzling employee's authority before depositing a check in his
personal account did not have a "fraudulent tendency to
deceive"). Moreover, Silver provides no opposition to

---

[28]    See Legore v. OneWest Bank, FSB, 898 F. Supp. 2d 912, 919
(D.Md. 2012) (quoting Parker v. Columbia Bank, 604 A.2d 521, 532
(Md. Ct. App. 1992))("Absent 'special circumstances,' the court
is reluctant to 'transform an ordinary contractual relationship
between a bank and its customer into a fiduciary relationship .
. . .'"); Taylor v. Equitable Trust, 304 A.2d 838, 842 (Md.
1973))("[T]he relation between a bank and its depositor is . . .
broadly defined as being that of debtor and creditor, the rights
of the depositor and the liability of the bank being
contractual." (internal citations omitted)).

Defendants' motions to dismiss Count VIII.

Accordingly, all claims in Count VIII shall be dismissed.


### 5. Civil Conspiracy (Count IX)

In Maryland, "'conspiracy' is not a separate tort capable of independently sustaining an award of damages in the absence of other tortious injury to the plaintiff." Alleco Inc. v. Harry & Jeanette Weinberg Found., Inc., 665 A.2d 1038, 1044–45 (1995)(quoting Alexander v. Evander, 650 A.2d 260, 265 n. 8 (1994)).

Accordingly, all claims in Count IX shall be dismissed but Silver is not prohibited from asserting against any Defendant liability on any viable claim as a conspirator.


IV.  CONCLUSION

For the foregoing reasons:

1.  Wells Fargo Bank, N.A.'s Motion to Dismiss Claims Asserted Against It in the Amended Complaint [ECF No. 40] is GRANTED IN PART and DENIED IN PART.

2.  PNC Bank, National Association's Motion to Dismiss Plaintiff Jeffrey J. Silver's Amended Complaint [ECF No. 43] is GRANTED IN PART and DENIED IN PART.

3.  All claims in the following Counts are hereby dismissed:

    a. Count II (Presentment Warranties);

    b. Counts IV and V (common law negligence);

    c. Count VI (violation of § 4-401);

d. Count VII (negligent hiring/supervision);

e. Count VIII (constructive fraud);

f. Count IX (civil conspiracy); and

g. Count X (conversion).

4.  There remain pending, all claims in the following Counts:

a. Count I (Lack of Ordinary Care);[29] and

b. Count III (Breach of Contract).

5.  Plaintiff shall arrange a case planning telephone conference to be held by July 10, 2017.

SO ORDERED, this <u>Friday, June 30, 2017</u>.

<u>                /s/                </u>
Marvin J. Garbis
United States District Judge

---

[29]   Only as to any claims that accrued on or after November 23, 2012, as explained herein.